**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| BETHEONA A. GUILES, Plaintiff, | : | |
| v. | : | 3:25-CV-01342 (SFR) |
| STATE OF CONNECTICUT, ET AL, Defendants. | : | |

## MEMORANDUM & ORDER

Plaintiff Betheona Guiles ("Guiles"), proceeding *pro se*, brings claims for various forms of workplace discrimination against the State of Connecticut Department of Administrative Services ("DAS"), and DAS employees Theresa Judge ("Judge"), Darren Hobbs ("Hobbs"), Ashley Dempsey ("Dempsey"), Peter Zvingilas ("Zvingilas"), Omarys Vasquez ("Vasquez"), Ashley Burke ("Burke"), Jordan Kubik ("Kubik"), and Michael Fuschi ("Fuschi") (collectively, "Defendants"). Defendants have moved to dismiss Plaintiff's Fourth Amended Complaint ("FAC") for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim pursuant to Rule 12(b)(6). For the following reasons, I GRANT in part and DENY in part Defendants' Motion to Dismiss.

## I. BACKGROUND

### A. Factual Background

The following facts alleged in the FAC are taken as true for the purpose of this Opinion.

Guiles "is [a] brown-skinned American Indian female." FAC, ECF No. 62, at 1.[1] DAS is a state government agency responsible for providing business and administrative functions to other state agencies, municipalities, and residents of Connecticut. *Id.* Judge, Hobbs, Dempsey, Zvingilas, Vasquez, Burke, Kubik, and Fuschi are employees of DAS, and therefore of the State of Connecticut. *Id.* at 1-3. During the period of the allegations in the FAC, Hobbs was Deputy Commissioner of Real Estate & Construction Services, Zvingilis was Assistant Director of Regulatory Compliance, Vasquez was State Building Inspector, and Fuschi was Construction Services Building Official Supervisor. *Id.* at 2-3. Judge, Dempsey, Burke, and Kubik all worked in Human Resources ("HR"). *Id.*

Guiles has been employed by the State of Connecticut since November 9, 2001. *Id.* at 5. On December 1, 2016, Guiles transferred into a Secretary 2 position with DAS. *Id.* In 2017, she was reclassified as an Administrative Assistant after performing out-of-class duties. *Id.* Throughout her employment, Guiles consistently received satisfactory performance evaluations. *Id.* Guiles is qualified for her role, holding degrees from the University of Connecticut and University of Hartford. *Id.* at 11.

On September 7, 2023, Vasquez expressed concern about Guiles's work supporting the Code & Standards Committee and Codes Amendment Subcommittee ("CAS"). *Id.* at 17. Vasquez "interfered with [Guiles's] assignments" and "created barriers between [Guiles] and new staff members." *Id.* Guiles asserts she was "excluded from communications and treated less favorably than white employees in similar roles." *Id.* That same month, Zvingilas,

[1] The FAC does not use consistent paragraph numbers and so I cite throughout this Opinion to the page numbers generated by ECF.

Vasquez, and Hobbs blocked Guiles from viewing their Outlook calendars, to which Guiles needed access in order to perform her job as an Administrative Assistant. *Id.* at 16. Lack of access excluded Guiles from the daily operations of DAS. *Id.*

Danielle Hart, a "white female" Secretary 2, was hired in November 2023. *Id.* at 10.[2] Hart is 27, while Guiles is over 40. *Id.* In November 2023, Zvingilas and Vasquez suggested training Hart to take over Guiles's entire job in the event of Guiles's retirement or absence. *Id.* at 18. Guiles, however, had indicated no plans to retire and held seniority over all clerical staff in her unit. *Id.* The plan to train Hart "implied that management was preparing to replace [Guiles] without cause, despite [her] qualifications and continued service." *Id.* Guiles asserts that overall, she was "excluded from communications [and] micromanaged" while two of her white co-workers "received support, inclusion, and harmonious treatment from management." *Id.* at 18-19. For example, Hart had full access to Zvingilas, Vasquez, and Hobbs's Outlook calendars and was their preferred point of contact. *Id.* at 16.

Guiles alleges that beginning in early 2024, she was treated differently than younger white employees in similar roles. *Id.* at 10. Guiles filed an internal DAS-Equal Employment Opportunity ("EEO") complaint on February 22, 2024, but that complaint was "deemed unsubstantiated." *Id.* at 30. In April 2024, "feel[ing] increasingly removed from the core functions of [her] role," Guiles contacted HR representative Judge. *Id.* On April 18, 2024, Hobbs and Judge confirmed that Guiles would continue supporting the Codes & Standards

[2] Guiles states that Hart was hired in November 2024. FAC 10. However, various of Guiles's allegations imply that Hart was employed by DAS as early as November 2023. *See id.* at 18 (describing Hart as "newly hired" in November 2023); *id.* at 20 (alleging that some of her job duties were reassigned to Hart in April 2024).

Committee but removed duties related to CAS and reassigned them to Hart, the younger white Secretary 2. *Id.* at 20. Vasquez nevertheless "repeatedly interfered with [Guiles's] assignments related to the Codes & Standards Hearings." *Id.* at 20. CAS duties were part of Guiles's core job functions, and she had, up to their reassignment, performed them consistently without issue. *Id.* at 21. On April 19, 2024, Guiles met with Judge and Hobbs to discuss her concerns; later that day, Judge "emailed [Guiles] a breakdown of duties—which, to [Guiles's] surprise, reassigned one of [her] core functions to Secretary 2 without explanation." *Id.* at 30.

On April 29, 2024, Hobbs, Zvingilas, and Vasquez directed a paralegal to verify whether Guiles had posted meeting dates on the Secretary of State's website. *Id.* at 22. Guiles alleges that she may have been delayed in posting the dates due to an unusually heavy workload but nevertheless remained committed to fulfilling all responsibilities. *Id.* at 23. She felt humiliated by the decision to publicly question her performance, especially given her longstanding record of reliability. *Id.*

In July 2024, Hobbs reassigned Guiles's assignment to track fleet vehicles to a co-worker without notice, and the co-worker was unaware of the reassignment until Guiles informed her. *Id.* at 23.

On September 19 and 20, 2024, Vasquez emailed Guiles, who was on vacation at the time, to reserve conference rooms. *Id.* at 17. Guiles offered to help upon her return from vacation and suggested training Hart to assist. *Id.* "Vasquez falsely claimed she didn't know" Guiles was on vacation and Zvingilas responded with a "hostile email" criticizing Guiles for not completing the task while on vacation. *Id.* at 18. Guiles filed another internal DAS-EEO complaint on September 23, 2024, in which she reported Zvingilas's conduct of

"confront[ing]" Guiles about not completing the task while on vacation despite having personally approved the vacation. *Id.* at 30-31.

At some unspecified time, Guiles requested accommodations under the Americans with Disabilities Act ("ADA"), and her "doctor and therapist placed [her] on remote work . . . due to anxiety and depression." *Id.* at 11. Guiles alleges: "Despite my continued ability to perform job duties remotely, I was excluded from meetings, stripped of responsibilities, and subjected to hostile treatment by DAS management." *Id.* at 12.

Guiles took approved leave under the Family and Medical Leave Act ("FMLA") from October 4 to November 19, 2024. *Id.* at 12. Upon Guiles's return from FMLA leave on November 19, 2024, Hobbs and Zvingilas reassigned the Codes & Standards Committee, including Guiles's Administrative Assistant role, to the Legal Division of Real Estate and Constructions Services. *Id.* at 31. "[A]pproximately 62%" of her duties were reassigned to an Administrative Assistant in the Legal Unit. *Id.* at 13. Since the time Guiles returned from FMLA leave, she has not been restored to equal responsibilities or the meaningfulness of her prior role. *Id.* at 25.

In her allegations, Guiles names five "white male coworkers" who took FMLA leave and returned to their same positions. *Id.* at 14. Dempsey, a "white female," took FMLA leave and was promoted. *Id.*

Guiles filed a Connecticut Commission on Human Rights and Opportunities ("CHRO") complaint in March 2025. *Id.* at 11. Guiles alleges that afterwards, "my duties were reassigned, I was excluded from meetings, and I received a disciplinary letter." *Id.*

On May 27, 2025, Fuschi submitted a sworn affidavit alleging that Guiles wore inappropriate clothing to a meeting held on January 6, 2025. *Id.* at 15. At the January meeting,

Guiles had on a "regular blouse" which she had previously worn into the office without issue. *Id.* Fuschi described the blouse as a "nightgown." *Id.* at 25. Zvingilas issued a disciplinary letter based solely on the affidavit without hearing evidence or testimony from Guiles. *Id.* at 16.

In August 2025, Hart was promoted to the higher-paying position of Licensed Application Analyst. *Id.* at 25; *see id.* at 10. Hart's promotion occurred after Guiles filed a complaint in the U.S. District Court for the District of Connecticut alleging employment discrimination. *Id.* at 10. Both Guiles and Hart reported to the same supervisor, but Guiles alleges that the defendants were "grooming Danielle Hart to replace me and force me into retirement." *Id.* Hart was promoted and trained for Guiles's role at the suggestion of Zvingilas, Hobbs, and Vasquez. *Id.* Guiles alleges that Hart "received more training, support, and favorable treatment than I did, despite my greater experience and seniority." *Id.* at 25. Hart was allowed to coordinate meetings and carry out her responsibilities "without interference or excessive oversight." *Id.* at 27. Guiles had "consistently received excellent and very good evaluations, but after Vasquez and Zvingilas came on board, [her] evaluations were downgraded without justification." *Id.* at 25.

Guiles alleges that she was subjected to a hostile work environment, citing the actions described above. Guiles also alleges that a hostile and isolating work environment was created when a white female manager responded to Guiles's emails privately through Microsoft Teams rather than publicly. *Id.* at 23. Furthermore, Guiles states that "I was harassed and questioned for taking time off, even though I had more accrued sick and vacation time than any other employee in my unit" *Id.* at 28.

Guiles also alleges that she was retaliated against for protected speech. Guiles states that "I am a YouTube Partner and content creator affiliated with my newspaper company *Copper-Colored Chronicles* and my nonprofit organization." *Id.* at 28. Her YouTube activity is part-time and conducted entirely outside the scope of her state employment. *Id.* She has never represented or spoken on behalf of DAS in any of her content. *Id.* During an investigation following one of Guiles's DAS-EEO complaints, Burke referenced Guiles's YouTube activity and a "fake letter sent to [DAS] by a YouTuber who disagreed with my content." *Id.* at 29. "Burke refused to consider the evidence I attempted to submit and instead relied on irrelevant personal activity to justify adverse conclusion." *Id.* Guiles alleges that DAS management, including Burke, used the speech as a basis for exclusion and reassignment of duties.

**B. Procedural History**

Guiles initiated this case when she filed her original Complaint in this Court on August 21, 2025. ECF No. 1. On August 29, 2025, Guiles filed an Amended Complaint. ECF No. 17. On October 2, 2025, Guiles filed her Second Amended Complaint. ECF No. 35. On October 22, 2025, I granted Guiles leave to amend the Second Amended Complaint. ECF No. 52. On October 23, 2025, Guiles filed her Third Amended Complaint. ECF No. 54. On November 12, 2025, I granted Guiles leave to amend her complaint again. ECF No. 60. On November 13, 2025, Guiles filed her Fourth Amended Complaint, the operative complaint in this case. ECF No. 62.

On November 24, 2025, Defendants filed their Motion to Dismiss the FAC, ECF No. 71, along with their Memorandum in Support. Mot. to Dismiss ("Defs.' Mem."), ECF No. 71-1. On November 24, 2025, Defendants filed a Motion to Stay Discovery. ECF No. 73. On November 27, 2025, Guiles filed her Memorandum in Opposition ("Pl.'s Mem."), ECF No.

81. Guiles also submitted hundreds of pages of exhibits to accompany her Memorandum in Opposition. ECF Nos. 85-90. On December 12, 2025, Defendants filed their Reply Brief ("Defs.' Reply"), ECF No. 97.

On December 17, 2025, I granted Guiles leave to file a single sur-reply. ECF No. 107. On December 17, 2025, I also granted Defendants' Motion to Stay Discovery pending the resolution of the Motion to Dismiss. *Id.* On December 18, 2025, Guiles filed her consolidated Sur-Reply in Opposition to the Motion to Dismiss ("Pl.'s Sur-Reply"), ECF No. 108-1.[3]

## II. <u>LEGAL STANDARD</u>

### A. Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Luckett v. Bure*, 290 F.3d 493, 496 (2d Cir. 2002) (citation modified). When considering a motion to dismiss for lack of subject-matter jurisdiction, the Court "must accept as true all material factual allegations in the complaint." *Blecher v. Holy See*, 146 F.4th 206, 216 (2d Cir. 2025) (citation modified).[4] "It is well-settled that the plaintiff bears the burden of proving subject

[3] On December 29, 2025, Defendants filed a Motion for Leave to File Supplemental Brief in order to respond to new facts and legal arguments that Guiles raises in her Sur-Reply. ECF No. 110. In this Opinion, I do not consider any new facts in, or exhibits submitted with, the Sur-Reply. As to new legal arguments, I do not find persuasive the Sur-Reply's legal argument that Guiles exhausted her administrative remedies under the ADA. *See* sectionIII.B.3, *infra*. And to the extent that Defendants read the Sur-Reply as arguing that *pro se* litigants have a lower burden when proving subject-matter jurisdiction, I follow the familiar rule that "before deciding any case [federal courts] are required to assure ourselves that the case is properly within our subject matter jurisdiction." *United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (citation modified).

[4] There may be some tension in prior decisions from the Second Circuit analyzing when it is appropriate to draw inferences in favor of the pleader on a Rule 12(b)(1) motion to dismiss. *See Agyapomaa v. Mayorkas*, 680 F. Supp. 3d 141, 147 n.2 (D. Conn. 2023) (collecting cases). In this

matter jurisdiction by a preponderance of the evidence." *Matthias v. United States*, 475 F. Supp. 3d 125, 133 (E.D.N.Y. 2020) (citation modified).

"Because the Eleventh Amendment restricts the judicial power under Article III, a motion to dismiss on the basis of sovereign immunity under the Eleventh Amendment is properly brought under Rule 12(b)(1)." *Mallison v. Connecticut Off. of Early Childhood*, 657 F. Supp. 3d 221, 227 (D. Conn. 2023) (citation modified).

**B. Rule 12(b)(6)**

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this "plausibility" requirement is "not akin to a probability requirement," it "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. I must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). However, I am not bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008).

Guiles is proceeding *pro se* in this litigation. "It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants." *Tracy v. Freshwater*, 623

---

ruling, I accept as true the allegations in the FAC and draw all reasonable inferences in favor of Guiles. *See id.*

F.3d 90, 101 (2d Cir. 2010). Consistent with this duty, the "submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (citation modified).

## III. <u>DISCUSSION</u>

Although the FAC includes thirty-one different "claims," many of these "claims" overlap factually and legally. Many of the "claims" are not labeled by legal claim (e.g., Title VII Hostile Work Environment) but instead are identified by headers such as "Claim XV: Suggestion to Replace Without Cause." FAC 18. In this Opinion, I examine the FAC by *legal* claim rather than by the "claims" as Guiles has described them. To assist the parties in understanding this Opinion, I have organized the claims I have discerned in the FAC by legal basis and labelled them as under Counts One through Eight.

Construing the FAC liberally, I find that Guiles alleges race discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (Count One); age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") (Count Two); discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA") (Count Three); interference and retaliation in violation of the federal FMLA (Count Four); interference and retaliation in violation of the Connecticut FMLA ("CT-FMLA") (Count Five); negligent and intentional infliction of emotional distress ("NIED" and "IIED") (Count Six); a violation of her First Amendment rights, which she brings under 42 U.S.C. § 1983 ("Section 1983") (Count Seven); and retaliation in violation of the Connecticut Fair Employment Practices Act ("CFEPA") (Count Eight). Guiles names as Defendants the Connecticut agency DAS and various DAS employees

in their official and individual capacities. I construe the FAC as alleging each of these Counts against DAS as well as each of these Counts against each individual defendant in their official and individual capacity.[5]

**A. Jurisdiction and Individual Liability Under the Relevant Statutes**

As an initial matter, I address whether this Court has jurisdiction over Guiles's claims and whether the causes of action under which Guiles brings this suit provide for individual liability.

**1. Claims Against DAS**

The Eleventh Amendment precludes "certain actions against state agents and instrumentalities" in federal court without the state's consent. *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015); *see Beaulieu v. Vermont*, 807 F.3d 478, 483 (2d Cir. 2015) (noting that while the Eleventh Amendment "identifies . . . immunity of a state's treasury from claims for damages brought by private entities in federal courts," states "also enjoy a broader sovereign immunity, which applies against *all* private suits, whether in state or federal court"). Guiles does not contest that DAS, as a Connecticut agency, is entitled to Eleventh Amendment immunity in federal court.

Eleventh Amendment immunity is not absolute. Congress may abrogate Eleventh Amendment immunity under the Fourteenth Amendment, and states may themselves choose to waive Eleventh Amendment immunity through statute or through litigation conduct. *See Beaulieu*, 807 F.3d at 483-84. But because the Eleventh Amendment implicates the federal

[5] Defendants do not address Guiles's claim of retaliation under CFEPA. FAC 32. I therefore allow Count Eight to proceed against all defendants, and limit my analysis in this Opinion to Counts One through Seven.

courts' subject-matter jurisdiction, Guiles "has the burden of proving that one or more of these exceptions applies." *Mallison*, 657 F. Supp. 3d at 233.

The law is well-settled that Connecticut has sovereign immunity from suits under the ADEA, Title I of the ADA, the FMLA, Connecticut tort law, and Section 1983. Because Guiles does not argue that DAS waived its immunity through litigation conduct, I dismiss Counts Two, Three, Four, Six, and Seven as to DAS. *See Mallison v. Connecticut Off. of Early Childhood*, 634 F. Supp. 3d 21, 40 (D. Conn. 2022) (stating that Connecticut has not waived sovereign immunity with respect to the ADEA); *Therault v. Town of Madison*, No. 3:23-cv-01301 (MPS), 2025 WL 1167487, at *5 (D. Conn. Apr. 22, 2025) (stating that Connecticut has not waived sovereign immunity with respect to the ADA); *Guzzo v. Connecticut State Colleges & Universities*, No. 3:21-cv-00254 (CSH), 2022 WL 903297, at *5 (D. Conn. Mar. 28, 2022) ("Connecticut has not waived its sovereign immunity with respect to the FMLA."); *Owoeye v. Conn.*, No. 3:14-cv-00664 (VLB), 2016 WL 1089179, at *4 (D. Conn. Mar. 18, 2016) (stating that Connecticut has not waived sovereign immunity with respect to NIED/IIED); *Turner v. Boyle*, 116 F. Supp. 3d 58, 74 (D. Conn. 2015) (stating that Connecticut has not waived sovereign immunity with respect to Section 1983).

I also dismiss Count Five as to DAS because the CT-FMLA does not present a clear waiver by Connecticut of its Eleventh Amendment immunity either in its definitions or in its judicial-review provisions, and Guiles makes no argument that DAS waived its Eleventh Amendment immunity. *See* Conn. Gen. Stat. § 31-51kk(4) ("employer" for purposes of the CT-FMLA does not include the state); Conn. Agencies Regs. § 31-51qq-43 (authorizing suits under the CT-FMLA in "courts of competent jurisdiction"); *Serafin v. Conn. Dept. of Mental Health and Addiction Servs.*, 118 F. Supp. 2d 274, 278 n.6 (D. Conn. 2000) (explaining that

states do not consent to suit in federal court by passing statutes authorizing suits against them in "courts of competent jurisdiction"); *see also Feliciano v. Jud. Branch*, No. 3:25-cv-01138 (RMS/KAD), 2025 WL 2267737, at *6 (D. Conn. July 29, 2025), *report and recommendation adopted* (D. Conn. Aug. 19, 2026) (concluding that Connecticut has not waived Eleventh Amendment immunity with respect to CFEPA even though CFEPA allows for claims in state courts).

I therefore dismiss Counts Two through Seven as to DAS on the ground of Eleventh Amendment immunity.

**2. Claims Against Individual Defendants in Their Official Capacities**

State sovereign immunity extends to actions for money damages against state employees in their official capacities. See *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). However, under *Ex parte Young*, plaintiffs may sue state employees in their official capacities to obtain injunctive relief for ongoing violations of federal law. "In considering whether a plaintiff has satisfied *Ex parte Young,* the Court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Goodspeed Airport, LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 632 F. Supp. 2d 185, 187 (D. Conn. 2009) (citation modified).

Under *Ex parte Young*, sovereign immunity is not a bar to prospective relief under Counts Two, Three, Four, and Seven. *See Feliciano*, 2025 WL 2267737, at *5 (ADEA); *id.* (ADA); *Burns v. Rovella*, No. 3:19-cv-00553 (JCH), 2019 WL 13123530, at *9 (D. Conn. Oct. 30, 2019) (FMLA); *Feliciano*, 2025 WL 2267737, at *5 (Section 1983). I will address below

Defendants' contention that Guiles has not pleaded facts sufficient to prove subject-matter jurisdiction over Counts Two, Three, Four, and Seven under *Ex parte Young*.

However, I dismiss Counts Five and Six as to the individual defendants in their official capacities. As discussed above, Connecticut has not waived sovereign immunity as to these claims. And because these Counts allege violations of state law, *Ex parte Young* does not apply. *Bogle v. Dep't of Mental Health & Addiction Servs.*, No. 3:23-cv-00323 (VAB), 2024 WL 1241923 (D. Conn. Mar. 22, 2024) ("*Ex parte Young* does not apply to claims alleging a violation of state law, rather than federal law or constitutional rights.").

Lastly, I dismiss Count One for failure to state a claim as to the individual defendants in their official capacities because Title VII does not allow for suit against individuals. *See Feliciano*, 2025 WL 2267737, at *4.

In sum, I therefore dismiss, as to the individual defendants in their official capacities, Count One for failure to state a claim and Counts Five and Six for lack of jurisdiction.

#### 3. Claims Against Individual Defendants in Their Individual Capacities

I dismiss Counts One, Two, and Three as to the individual defendants in their individual capacities for failure to state a claim because individuals are not subject to liability for violations of Title VII, the ADEA, or the ADA. *See Feliciano*, 2025 WL 2267737, at *4 (Title VII); *Plank v. Town of Wilton*, No. 3:23-cv-00808 (VDO), 2024 WL 4063879, at *2 (D. Conn. Sept. 5, 2024) (ADEA); *Yerdon v. Poitras*, 120 F.4th 1150, 1155 (2d Cir. 2024) (ADA).

In Connecticut, "[n]o state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his or her duties or within the scope of his or her employment." Conn. Gen. Stat. § 4-165(a). Guiles's NIED claim is

based solely on the individual defendants' performances of their official duties, and she does not allege facts to plausibly show that the individual defendants acted wantonly, recklessly, or maliciously. *See Johnson v. Cook*, No. 3:19-CV-1464 (CSH), 2021 WL 2741723, at *22 (D. Conn. 2021). Accordingly, Section 4-165(a) of the Connecticut General Statutes bars Guiles's NIED claim.

In sum, I therefore dismiss, as to the individual defendants in their individual capacities, Counts One through Three and the NIED claim in Count Six for failure to state a claim.

**B. Defendants' Motion to Dismiss the Surviving Counts**

Defendants move to dismiss all of Guiles's remaining claims.

Defendants move to dismiss the following claims for lack of subject-matter jurisdiction: the ADEA claims against the individual defendants in their official capacities (Count Two), the ADEA claim against the individual defendants in their official capacities (Count Three), the FMLA claims against the individual defendants in their official capacities (Count Four), and the Section 1983 claim for violation of Guiles's First Amendment rights against the individual defendants in their official capacities (Count Seven). Defs.' Mem. 10.

Defendants move to dismiss the following claims for failure to state a claim: Title VII claims against DAS (Count One), FMLA and CT-FMLA claims against the individual defendants in their individual capacities (Counts Four and Five), the IIED claim against the individual defendants in their individual capacities (Count Six), and the Section 1983 claim for violation of Guiles's First Amendment rights against the individual defendants in their individual capacities (Count Seven). *Id.* at 20.

I address Defendants' argument by each Count of the FAC. I discuss the FMLA and CT-FMLA claims together because the same legal analysis applies to both. *See Cendant Corp.*

*v. Comm'r of Lab.*, 276 Conn. 16, 23 (2005) (directing that "FMLA jurisprudence guides [] interpretation of the provisions of the" CT-FMLA).

### 1. Title VII Claims (Count One)

Guiles alleges race discrimination, hostile work environment, and retaliation in violation of Title VII against DAS. Defendants deny each of these claims and argue that many of Guiles's allegations are time-barred. Defs.' Mem. 21-30.

Title VII requires Connecticut plaintiffs to file an Equal Employment Opportunity Commission ("EEOC") or CHRO complaint within 300 days of the alleged discriminatory workplace action. 42 U.S.C. § 2000e-(e)(1). "This statutory requirement operates as a statute of limitations." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 259 (2d Cir. 2023) (citation modified). "For plaintiffs alleging unlawful discrimination or retaliation, discrete actions such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify and are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* (citation modified). Claims alleging a hostile work environment are treated differently: because "incidents that give rise to a hostile work environment occur over a series of days or perhaps years and a single act of harassment may not be actionable on its own . . . [s]o long as an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 260 (citation modified).

Guiles does not respond to Defendants' argument about timeliness, instead reciting that she "timely filed charges with the CHRO and EEOC." Pl.'s Mem. 12. I will therefore consider actions before June 7, 2024, 300 days before Guiles's administrative complaint filed on April

3, 2025, only insofar as they contribute to a hostile work environment that continued into the filing period. *See* Defs.' Mem. 21; ECF No. 71-3, at 9.

**a. Discrimination**

For a Title VII discrimination claim to survive a motion to dismiss, "what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015). Defendants contest only the last two prongs, arguing that DAS did not take any adverse employment actions against Guiles and, even if DAS did, that any such actions were not because of Guiles's race. Defs.' Mem. 22-27.

I conclude that Guiles suffered an adverse employment action during the filing period when "62% of [Guiles's] responsibilities were reassigned" when she returned from FMLA leave. FAC 16. In her briefing, Guiles clarified that she suffered a 62% reduction of her duties. Pl.'s Mem. 15. Guiles has therefore sufficiently alleged that she suffered "some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 355 (2024). At this stage, all Guiles need plead are facts that plausibly support the proposition that she suffered an adverse employment action.

I also conclude that Guiles has given support to a minimal inference of discriminatory motivation. As the Second Circuit has explained, such "[a]n inference of discrimination can arise from circumstances including . . . the more favorable treatment of employees not in the protected group." *Littlejohn*, 795 F.3d at 312. According to Guiles, "younger white employees were advanced and supported while Plaintiff, a brown-skinned American Indian woman over

40, was excluded, reassigned, and targeted for removal." Pl's. Mem. 16. For instance, Guiles compares herself to Hart, a white employee who "was promoted to the position of Licensed Application Analyst" and "received more training, support, and favorable treatment than [Guiles] did, despite [Guiles's] greater experience and seniority." FAC 25. Guiles also alleges that six of her white co-workers took FMLA leave and returned at the same level or were promoted, while Guiles lost many of her job responsibilities after taking FMLA leave. *Id.* at 14.

Guiles has alleged that she was treated differently than her white co-workers in materially significant ways. "These allegations are sufficient to give Defendant notice of Plaintiff's claims under Rule 8(a), and satisfy this *pro se* plaintiff's burden to plead a minimal plausible inference of discriminatory intent." *Shouq v. Norbert E. Mitchell Co.*, No. 3:18-cv-00293 (CSH), 2018 WL 4158382, at *10 (D. Conn. Aug. 30, 2018); *Berroa v. Dep't of Developmental Servs.*, No. 3:19-cv-00867 (JCH), 2020 WL 12863317, at *9 (D. Conn. Sept. 17, 2020) (concluding that the plaintiff's allegations that she was scrutinized in a way non-Hispanic employees were not gave rise to a minimal inference of discrimination); *see Johnson v. Connecticut Dep't of Admin. Servs. Bureau of Enter. Sys. & Tech.*, No. 3:17-cv-00901 (JAM), 2018 WL 306697, at *8 (D. Conn. Jan. 5, 2018) (concluding that the plaintiff raised a minimal inference of discrimination where he relied "exclusively on the fact that he was treated differently from other employees in his work center"). I therefore conclude that the facts alleged in the Fourth Amended Complaint provide the "minimal support" necessary for Guiles to survive Defendants' motion to dismiss the Title VII discrimination claim.

**b. Hostile Work Environment**

Guiles alleges that she was subjected to a hostile work environment. She cites (1) DAS-EEO investigations after her complaints that did not ultimately find discrimination; (2) Hart's promotion; (3) her being "blocked from viewing calendars, excluded from meetings, and stripped of responsibilities without notice"; (4) a disciplinary letter for wearing inappropriate clothing to a meeting; (5) a "hostile email criticizing [her] for not completing [a] task while on" vacation; (6) a suggestion that Hart be trained to assume Guiles's responsibilities in the event of Guiles's absence or retirement; and (7) the reassignment of Guiles's job responsibilities to her co-workers; (8) a private, rather than a public, response from a manager; and (9) being harassed and questioned for taking time off. FAC 9, 10, 14, 15-16, 18, 22, 23, 28. Defendants argue that the facts alleged do not support the existence of a hostile work environment. Defs.' Mem. 28.

"To establish a hostile work environment under Title VII . . . a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320-21 (citation modified).

Guiles's allegations are insufficient to support a finding of hostile work environment that is so severe or pervasive as to have altered the conditions of her employment. Many of the actions she describes are squarely within the scope of managerial discretion as to employee responsibility, and not intimidating, harassing, or abusive. Indeed, it is hard to understand how some of the described actions could be perceived as ill-mannered, let alone as hostile. Guiles describes receiving a hostile email and being harassed for taking time off but offers no specific factual allegations to demonstrate those conclusions. *Cf. id.* at 321 (finding that allegations that

a manager made negative statements about a plaintiff, was impatient and used harsh tones with the plaintiff, physically distanced herself from the plaintiff, declined to meet with the plaintiff, replaced the plaintiff at meetings, and wrongfully reprimanded the plaintiff insufficient to sustain a hostile working environment).

In sum, Guiles's allegations are insufficient to plead a hostile working environment, and I dismiss her hostile working environment claim against DAS.

**c. Retaliation**

Retaliation claims made under Title VII are evaluated under a burden shifting analysis in which the plaintiff must first establish a *prima facie* case of retaliation. *Carr v. New York City Transit Auth.*, 76 F.4th 172, 180 (2d Cir. 2023). In order to establish a *prima facie* case of retaliation, a plaintiff must demonstrate that "(1) she engaged in protected activity, (2) the defendant was aware of that activity, (3) she was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between the protected activity and the materially adverse action or actions." *Id.* at 180. Defendants contest only the last two prongs, arguing that DAS did not take any adverse actions against Guiles and, even if DAS did, that any such actions were not because of Guiles's internal DAS-EEO or CHRO complaints. Defs.' Mem. 27-28.

Guiles alleges that she filed two internal DAS-EEO complaints in February and September of 2024 and a CHRO complaint in March of 2025. FAC at 11; *see* ECF No. 71-3, at 8. I already determined that Guiles suffered an adverse employment action when she lost 62% of her job responsibilities in November 2024. *See* Pl.'s Mem. 11-12. Guiles also alleged a reassignment of her duties in April 2024 and a disciplinary letter given in May 2025 on the basis of clothing she had worn to work previously. FAC 12, 16. *See Carr*, 76 F.4th at 181

(holding that "when analyzing a retaliation claim, the sole inquiry regarding the third element . . . is whether the actions, taken in the aggregate, are materially adverse and would dissuade a reasonable employee from making a complaint of discrimination").

The Second Circuit has "regularly held that the causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Summa v. Hofstra Univ.*, 708 F.3d 115, 127-28 (2d Cir. 2013); *see Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 92 (2d Cir. 2015) (finding complaint adequately pleaded causation because adverse actions occurred two months after protected activity); *see id.* ("Some of these actions, considered individually, might not amount to much. Taken together, however, they plausibly paint a mosaic of retaliation and an intent to punish Vega for complaining of discrimination.").

I conclude that Guiles has plausibly alleged an adverse action in close temporal proximity to protected activity and deny Defendants' motion to dismiss Guiles's Title VII retaliation claim against DAS.

**2. ADEA Claim (Count Two)**

Guiles alleges age discrimination in violation of the ADEA against the individual defendants in their official capacities. Defendants argue that Guiles's age discrimination claim must "fail because she has not alleged sufficient facts to establish that any Official Capacity Defendant could grant the relief she requests." Defs.' Mem. 15. In particular, Defendants state that Guiles "does not allege, however, that any Official Capacity Defendant has the power to 'restore' to her job duties that are now assigned to other staff, remove the purported 'disciplinary' letter from her file, or implement antidiscrimination training and oversight." *Id.* at 11.

Guiles has, however, alleged that "DAS management" includes Defendants Vasquez, Zvingilas, Judge, Dempsey, Kubik, Burke, and Hobbs, and specifically alleges that these defendants "reassigned my duties without justification." FAC 24, 28. It is plausible that employees in managerial roles who have the power to reassign duties could *again* reassign duties to remedy any ongoing age discrimination—exactly the prospective relief which Guiles is entitled to seek under *Ex parte Young*. *See Feliciano*, 2025 WL 2267737, at *5. Guiles has not, however, alleged that Fuschi has the power to remedy any ongoing age discrimination, nor indeed that he performed any discriminatory actions. The only allegation Guiles makes against Fuschi is that he once "submitted a sworn affidavit alleging that [Guiles] wore inappropriate clothing to a meeting." FAC 15.

I therefore dismiss Count Two against Fuschi in his official capacity, but deny the motion to dismiss Count Two as to the remaining individual defendants in their official capacities.

**3. ADA Claims (Count Three)**

Guiles alleges discrimination and retaliation in violation of the ADA against the individual defendants in their official capacities. Defendants contend that Guiles cannot bring any claims under the ADA because she failed to exhaust her administrative remedies through the EEOC or CHRO. Defs.' Mem. 13-14. Guiles disagrees, arguing that she "exhausted administrative remedies through CHRO and EEOC releases." Pl.'s Mem. 2; *see* Pl.'s Sur-Reply 2.

A plaintiff seeking to bring a claim under the ADA must exhaust administrative remedies through the EEOC or CHRO. *Soules v. Connecticut, Dep't of Emergency Servs. & Pub. Prot.*, 882 F.3d 52, 57 (2d Cir. 2018). The plaintiff need not plead exhaustion because

failure to exhaust is an affirmative defense on which a defendant bears the burdens of pleading and proof. *See Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 491 (2d Cir. 2018). However, a defendant may raise failure to exhaust as an affirmative defense where non-exhaustion is clear from documents that can be considered on a motion to dismiss. *See Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 594 n.5 (E.D.N.Y. 2013).

Here, both Guiles and Defendants cite to the charges filed with the CHRO and EEOC. ECF No. 71-3; Pl.'s Mem. 12; Defs.' Mem. 14. Because Guiles had actual notice of the CHRO and EEOC charges when framing her complaint, *see* FAC 7, and these are records from the relevant administrative bodies, I take up the issue of exhaustion. *See Holmes v. Fresh Direct*, No. 13-cv-4657 (NGG) (CLP), 2015 WL 4885216, at *4 (E.D.N.Y. Aug. 5, 2015) ("[W]here exhaustion of administrative remedies is a prerequisite to bringing suit, the court may take judicial notice of the public records and reports of relevant administrative bodies, as well as the facts set forth therein."); *Allen v. Kunkel*, No. 3:18-cv-00297 (JCH), 2018 WL 3553335, at *4 (D. Conn. July 23, 2018) ("In deciding a motion to dismiss, the court may also consult extrinsic materials if they are integral to the plaintiff's claims and the plaintiff had notice of that information.") (citation modified).

Guiles does not claim discrimination under the ADA in either her CHRO or her EEOC complaint. ECF No. 71-3, at 4, 9.

Notwithstanding the ADA's exhaustion requirement, "claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency." *Soules*, 882 F.3d at 57 (citation modified). "Subsequent conduct is reasonably related to conduct in an EEOC charge if: [1] the claim would fall within the reasonably expected scope of an EEOC investigation of the charges of

discrimination; [2] it alleges retaliation for filing the EEOC charge; or [3] the plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Id.* (citation modified).

Guiles cannot claim the first exception to the exhaustion requirement, as she only claimed race and age discrimination in her administrative complaints, and alleged no facts from which the EEOC would receive notice to investigate discrimination on the basis of disability. ECF No. 71-3, at 4-7, 9; *see Pagan v. N. Atl. States Reg'l Council of Carpenters*, No. 3:24-cv-01535 (JCH), 2025 WL 2092112, at *3 (D. Conn. July 25, 2025) (dismissing age discrimination claim when administrative complaints referenced only racial discrimination). And because Guiles's EEOC and CHRO charges do not mention disability, discrimination on the basis of disability, or any actions that could plausibly constitute discrimination on the basis of disability, neither the second nor third exceptions apply.

In sum, Guiles has failed to exhaust her administrative remedies as is required by the ADA, and so I dismiss her ADA claims against the individual defendants in their official capacities under Rule 12(b)(6).

### 4. FMLA and CT-FMLA Claims (Counts Four and Five)

Guiles alleges interference and retaliation in violation of the federal FMLA against the individual defendants in their official and individual capacities, and interference and retaliation in violation of the CT-FMLA against the individual defendants in their individual capacities. *See Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 166 (2d Cir. 2017) ("FMLA claims come in at least two varieties: interference and retaliation.").

I dismiss the interference claim in Count Four against the individual defendants in their official capacities because Guiles has not alleged that there is ongoing interference with her

ability to exercise her FMLA rights which would be remedied by prospective relief, as is required by *Ex parte Young*. *See Goodspeed*, 632 F. Supp. 2d at 187. In contrast, for the same reasons as I laid out with respect to Guiles's ADEA claim under *Ex parte Young*, *see* section III.B.2, *supra*, I dismiss Count Four against Fuschi in his official capacity, but deny the motion to dismiss the retaliation claim in Count Four as to the remaining individual defendants in their official capacities. *See* Defs.' Mem. 16.

I next turn to Guiles's interference and retaliation claims under the FMLA and CT-FMLA against the individual defendants in their individual capacities.[6]

**a. Interference**

An interference claim serves an "*ex ante*" purpose, protecting an employee "when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA." *Woods*, 864 F.3d at 166. On an interference claim, a plaintiff must show that "she was denied benefits to which she was entitled under the FMLA." *Haran v. Orange Bus. Servs., Inc.*, 160 F.4th 51, 57 (2d Cir. 2025).

Defendants argue that "does not allege that any Individual Capacity Defendant prevented or impeded her from taking FMLA leave, and therefore cannot assert an FMLA interference claim against any Individual Capacity Defendant." Defs.' Mem. 42.

I agree. Although Guiles uses the language of interference multiple times, she offers no facts to support a claim of interference. *See, e.g.*, FAC 4, 12; Pl.'s Mem. 23. On the contrary,

---

[6] At least at the motion to dismiss stage of the case, I reject Defendants' argument that the individual defendants are entitled to qualified immunity with respect to Guiles's FMLA claims. Defs.' Mem. 46; *see Santiago v. Dep't of Transp.*, 50 F. Supp. 3d 157 (D. Conn. 2014) (concluding that "FMLA rights are clearly established by statute and a reasonable employer would understand that it is unlawful to deny such rights").

Guiles repeatedly characterizes her FMLA leave as having been approved. *See, e.g.*, FAC 12 ("I took approved leave under the Family and Medical Leave Act (FMLA) from October 4 to November 19, 2024."). The Defendants' actions which Guiles alleges violated her FMLA rights commenced "immediately upon return" from her leave, not during, Pl.'s Mem. 23, and so do not amount to a denial of her benefits—namely, her monthlong leave.

I therefore dismiss Guiles's interference claim under the FMLA and CT-FMLA against the individual defendants in their individual capacities.

**b. Retaliation**

A retaliation claim under the FMLA is an "*ex post*" claim involving an "employee actually exercising her rights . . . under the FMLA and then being subjected to some adverse employment action by the employer." *Woods*, 864 F.3d at 166. FMLA retaliation claims are evaluated under the *McDonnell Douglas* framework. *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004).

Defendants dispute only the third prong of *McDonnell Douglas*, arguing that Guiles did not suffer an adverse employment action because the "facts pled do not establish that [Guiles] suffered any harm, whatsoever, from the reassignment of duties." Defs.' Mem. 42. I disagree. Guiles alleges that she lost "62% of [her] responsibilities" and has "not been restored to equal responsibilities or the meaningfulness of [her] prior role." FAC 16, 25. As I concluded above, Guiles has therefore sufficiently alleged that she suffered an adverse employment action. *See Muldrow*, 601 U.S. at 355.

Lastly, Defendants deny that Guiles has alleged the personal involvement of the individual defendants. Defs.' Mem. 42. I dismiss Count Four and Five against Fuschi, *see*

section III.B.2, *supra*, but deny the motion to dismiss Counts Four and Five as to the remaining individual defendants in their individual capacities.

**5. IIED Claim (Count Six)**

Guiles asserts a claim of IIED against the individual defendants in their individual capacities. In Connecticut, a plaintiff alleging IIED must plead "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Watts v. Chittenden*, 301 Conn. 575, 586 (2011) (citation modified).

Defendants argue that none of the actions alleged in the FAC constitute extreme and outrageous conduct. Defs.' Mem. 47. Guiles responds that she alleges "false accusations of improper attire, sabotage of job duties, and retaliatory investigations," and that these behaviors rise to the level of extreme and outrageous. Pl.'s Mem. 32.

"Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." *Appleton v. Bd. of Educ. of the Town of Stonington*, 254 Conn. 205, 211 (2000). I agree with Defendants that Guiles's allegations are insufficient to plead extreme and outrageous behaviors from the individual defendants.

First, Guiles's allegations that her job duties were reassigned, that she lost access to her co-workers' Outlook calendars, and that a co-worker responded to her emails privately rather than publicly do not rise to the level of extreme and outrageous conduct. *See Williams v. Deloitte Servs., LP*, No. 3:09-cv-00017 (JCH), 2009 WL 3571365, at *3 (D. Conn. Oct. 26,

2009) (explaining that "routine employment action," including "unfair discipline, negative performance reviews, and failures of promotion" are not extreme and outrageous conduct). Second, even taking as true that Guiles was subject to a retaliatory investigation, "retaliating against an employee for complaining about [] discrimination do[es] not meet the standard for finding that conduct was extreme and outrageous." *Apatow v. Town of Stratford*, 651 F. Supp. 3d 573, 592 (D. Conn. 2023) (citation modified). Finally, a false accusation of improper attire is no more extreme and outrageous than the "insults, verbal taunts, threats, indignities, annoyances, petty oppressions or conduct that . . . are usually not deemed extreme and outrageous conduct." *Craig v. Yale Univ. Sch. of Med.*, 838 F. Supp. 2d 4, 10 (D. Conn. 2011) (citation modified).

Guiles contends she suffered "emotional distress" as a result of the individual defendants' actions. FAC 8. But because "it is clear that individuals in the workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace," *Perodeau v. City of Hartford*, 259 Conn. 729, 757 (2002), and Guiles has not alleged any behavior that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," *Apatow*, 651 F. Supp. 3d at 591, I dismiss Count Six against the individual defendants in their individual capacities.

**6. First Amendment Claim (Count Seven)**

Pursuant to 42 U.S.C. § 1983, Guiles asserts a claim of retaliation in violation of the First Amendment against the individual defendants in their official and individual capacities. "To establish a claim for First Amendment retaliation, [a plaintiff] must demonstrate that: (1) [her] speech or conduct was protected by the First Amendment; (2) [s]he suffered an adverse

employment action; and (3) [there exists] a causal connection between the protected activity and adverse employment action." *Grande v. Hartford Bd. of Educ.*, 804 F. Supp. 3d 334, 348 (D. Conn. 2025).

Speech by public employees is analyzed under the two-step test described in *Garcetti v. Ceballos*, 547 U.S. 410 (2006) and *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563 (1968). "The first [component] requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti*, 547 U.S. at 418 (citation modified). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). "If the first component is present, an employer must then show that it had an adequate justification for treating the employee differently based on his or her speech from any other member of the general public." *Montero v. City of Yonkers, New York*, 890 F.3d 386, 395 (2d Cir. 2018) (citation modified).

Defendants contend that Guiles "has not alleged even the barest of facts from which the Court could infer that her speech was protected." Defs.' Mem. 32. In the FAC, Guiles attests to running a YouTube channel affiliated with her newspaper company *Copper-Colored Chronicles*, and says that her "content addressed matters of public concern." FAC 28-29. However, Guiles provides no other information as to the content, form, and context of her speech. Guiles's allegations that Burke "referenced [her] YouTube activity" and that a "fake letter [was] sent to my employer by a YouTuber who disagreed with my content" similarly shed no light as to the content of Guiles's speech, and therefore as to whether it was addressing

a matter of public concern. *Id.* at 29.[7] Because I conclude that Guiles has failed to plead that she was speaking on a matter of public concern, I do not address whether Guiles has sufficiently alleged an adverse employment action or a causal connection between any protected speech and adverse employment action.

Accordingly, I grant Defendants' motion to dismiss Count Seven against the individual defendants in their official and individual capacities.

## IV. CONCLUSION

For the foregoing reasons, I GRANT in part and DENY in part Defendants' Motion to Dismiss.

I dismiss Count One as to the individual defendants in their official and individual capacities; Count Two as to DAS and the individual defendants in their individual capacities; Count Three against all defendants; Count Four against DAS; Count Five against DAS and the individual defendants in their official capacities; Count Six against DAS and the individual defendants in their official capacities; and Count Seven as to DAS.

Guiles will not be permitted to replead these claims.

I dismiss the following claims without prejudice and with leave to replead: in Count One, the Title VII hostile work environment claim against DAS; in Count Two, the claim for prospective relief against Fuschi in his official capacity; in Count Four, the claim for prospective relief against Fuschi in his official capacity, the FMLA retaliation claim against Fuschi in his individual capacity, and the FMLA interference claim against the individual

[7] Given that this is a 12(b)(6) motion to dismiss, I do not consider the exhibits Guiles filed alongside her Memorandum. *See* ECF Nos. 85-90.

defendants in their individual capacities; in Count Five, the CT-FMLA retaliation claim against Fuschi in his individual capacity, and the CT-FMLA interference claim against the individual defendants in their individual capacities; in Count Six, the NIED and IIED claims against the individual defendants in their individual capacities; and Count Seven as to the individual defendants in their official and individual capacities.

If Guiles wishes to replead these specific claims with additional facts, she shall file a Fifth Amended Complaint on or before October 21, 2026. The Fifth Amended Complaint shall assert claims only under Counts One, Two, Four, Five, Six, Seven, and Eight as I have defined them here, *see* section III, *supra*, and each claim shall indicate the defendants against whom the claim is being pursued. Any motion to amend filed after this date, or not in accordance with the above instructions, will be subject to the good cause standard of Fed. R. Civ. P. 16(b)(4).

If Guiles does not file a Fifth Amended Complaint, the following claims will proceed: in Count One, the Title VII discrimination and retaliation claims against DAS; in Count Two, the claim for prospective relief against the individual defendants except Fuschi; in Count Four, the claim for prospective relief against the individual defendants in their official capacities except Fuschi and the FMLA retaliation claim against the individual defendants in their individual capacities except Fuschi; in Count Five, the CT-FMLA retaliation claim against the individual defendants in their individual capacities except Fuschi; and in Count Eight, the CFEPA retaliation claim against all defendants.

The stay of discovery shall remain in place while Guiles considers whether to file a Fifth Amended Complaint. If Guiles files a Fifth Amended Complaint, then the Defendants shall file an answer to the Fifth Amended Complaint by October 28, 2026. If Guiles does not

file a Fifth Amended Complaint, the parties are directed to meet and confer to prepare a Local Rule 26(f) report, which shall be filed on or before November 12, 2026 and indicate whether the parties seek referral to a United States Magistrate Judge for the purpose of conducting a settlement conference. The Court will thereafter set a schedule for discovery in this case.

Defendants' Motion for Leave to File a Supplemental Brief, ECF No. 110, and Guiles's Motion for Relief From the Stay of Discovery, ECF No. 118, are both found as moot.

**SO ORDERED.**

New Haven, Connecticut
September 30, 2026

/s/ *Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge